PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-2846
_____

WILLIAM L. BURRELL, JR.; JOSHUA HUZZARD;
DAMPSEY STUCKEY

v.

TOM STAFF, Individually; LOUIS DENAPLES,
individually; DOMINICK DENAPLES; LACKAWANNA
RECYCLING CENTER INC; COUNTY OF
LACKAWANNA; LACKAWANNA COUNTY SOLID
WASTE MANAGEMENT AUTHORITY


William L. Burrell, Jr.; Joshua Huzzard; Dampsey Stuckey;
*Anthony Cravath; *Anthony John Goodwin, Sr.;
*Derrick M. Lake; *Eugene R. Taylor; *Ralph Wasko;
*Timothy Alan Whited; *Torrance Allen; *Gabriel Martinez;
and *Gerard Nelson,
                                        Appellants

*(Pursuant to Rule 12(a), Fed. R. App. P.)
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania

(District Court Civil No. 3-14-cv-01891)
District Judge:  Honorable Robert D. Mariani

Argued July 14, 2022

BEFORE:  GREENAWAY, JR., MATEY,
and NYGAARD, *Circuit Judges*

(Filed: February 8, 2023)

Jacob Demree
Sanders K. Gilmer
Alessandra Lopez
Madeline Meth
Samuel Myers
Jacob Rosen
Daniel Wassim
Brian S. Wolfman
Georgetown University Law Center
Appellate Courts Immersion Clinic
600 New Jersey Avenue
Suite 312
Washington, DC 20001

Matthew K. Handley
Rachel E. Nadas
Handley Farah & Anderson
200 Massachusetts Avenue, N.W.
Seventh Floor
Washington, DC 20001

Marielle R. Macher
Community Justice Project
118 Locust Street
Harrisburg, PA 17101

Juno Turner [Argued]
Towards Justice
P.O. Box 371680
Pmb 44465
Denver, CO 80237

    *Counsel for Appellants*

Philip A. Davolos, III
David E. Heisler [Argued]
Cipriani & Werner
415 Wyoming Avenue
Scranton, PA  18503

    *Counsel for Appellees Staff, County of Lackawanna*

Jeffrey Belardi
Belardi Law Offices
50 Alberigi Drive
Suite 114, The TekRidge Center
Jessup, PA 18434

Christopher R. Nestor
David R. Overstreet [Argued]
Overstreet & Nestor
461 Cochran Road, P.O. Box 237
Pittsburgh, PA 15228

*Counsel for Appellees L. DeNaples, D. DeNaples, Lackawanna Recycling Center Inc.*

Sarah R. Lloyd [Argued]
Cognetti & Cimini
538 Spruce Street
800 Scranton Life Building
Scranton, PA 18503

*Counsel for Appellee Lackawanna County Solid Waste Management Authority*

Brianne J. Gorod
Constitutional Accountability Center
1200 18th Street, N.W., Suite 501
Washington, DC 20036

*Counsel for Amicus Appellants Constitutional Accountability Center, ACLU of Pennsylvania*

Erin H. Flynn
Katherine E. Lamm [Argued]
United States Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
Ben Franklin Station
Washington, DC 20044

*Counsel for Amicus Curiae United States of America*

Catherine Ruckelshaus
National Employment Law Project
90 Broad Street, Suite 1100
New York, NY 10004

> *Counsel for Amicus Appellants Community Legal*
> *Services of Philadelphia, Justice at Work*
> *Pennsylvania, National Employment Law Project,*
> *National Employment Lawyers Association,*
> *Pennsylvania Institutional Law Project*

_____

OPINION OF THE COURT
_____

NYGAARD, *Circuit Judge.*

Plaintiff child support debtor-civil contemnors brought several claims against Lackawanna County, the County's Solid Waste Management Authority, Lackawanna County Recycling Center, Inc. (the private corporation to which the Authority outsources the operation of its Recycling Center, or the "Corporation") and the Corporation's owners (brothers Louis and Dominick DeNaples), arising out of plaintiffs' nearly unpaid labor at the Recycling Center. The District Court dismissed all claims, and plaintiffs appealed.[1]

_____

[1] Plaintiffs do not appeal the dismissal of their claims against defendant Tom Staff, an administrator employed by Lackawanna County who regulated the Work Release Program and the Community Service Program at the Lackawanna

5

We will affirm dismissal of plaintiffs' Thirteenth Amendment and Pennsylvania Wage Payment and Collection Law claims in full, and of their Trafficking Victims Protection Act ("TVPA") and Racketeer Influenced and Corrupt Organizations Act ("RICO") claims against the DeNaples brothers.[2]

However, we will reverse dismissal of their TVPA claims against the County, the Authority, and the Corporation; their RICO claims against the Corporation; their Fair Labor Standards Act ("FLSA") and Pennsylvania Minimum Wage Act claims against the County, the Authority, and the Corporation; and their unjust enrichment claims against the County, the Authority, and the Corporation.[3]

## I.    BACKGROUND

Plaintiffs William Burrell, Jr., Joshua Huzzard, and Dampsey Stuckey were held in civil contempt and sentenced to incarceration for not paying child support. They challenge Lackawanna County's policy of conditioning incarcerated civil contemnor child support debtors' access to regularly paid work release on first working for half of their sentences sorting

County Prison. "All defendants" thus means the County, the Authority, the Corporation, and the DeNaples brothers.

[2] Plaintiffs do not appeal the dismissal of their RICO claims against the County and the Authority.

[3] Plaintiffs press their Fair Labor Standards Act claims on behalf of a FLSA collective and the rest of their claims on behalf of a Rule 23 class.

6

through trash at the Recycling Center, in purportedly dangerous and disgusting conditions, for sixty-three cents per hour (five dollars per day), nominally as "community service."

Burrell first filed a complaint in September 2014 and a First Amended Complaint ("FAC") in December 2014, both *pro se*, describing the County's policy of conditioning work release on work at the Center, the Center's hazardous conditions and subminimum wages, and alleging, as relevant here, Thirteenth Amendment, TVPA, RICO, and state-law claims. Although Burrell did not expressly invoke FLSA, the FAC alleged that he was paid five dollars per day to work forty hours per week at the Center.

The District Court dismissed the amended complaint before service of process. A panel of this Court affirmed in part and vacated in part. *Burrell v. Loungo*, 750 F. App'x 149, 160 (3d Cir. 2018). The panel reversed the District Court's dismissal of Burrell's TVPA and Thirteenth Amendment claims because although Burrell alleged that "he had a 'choice'—either work in the LRC or spend an extra six months in prison—given the dearth of case law in this area, it is not clear, especially at the screening stage, whether this 'choice' was sufficient to bring the alleged practice of coercing civil contemnors to work in the LRC out of the range of involuntary servitude." *Id.* at 159–60 (cleaned up). The panel also said in a footnote that

> One might argue, of course, that as a civil contemnor who would be released once he paid his child support obligations, Burrell "carr[ied] the keys of [his] prison in [his] own pockets." *Turner v. Rogers*, 564 U.S. 431, 441-42, 131

7

S.Ct. 2507, 180 L.Ed.2d 452 (2011). We leave it to the District Court to consider such an argument.

*Id.* at 160 n.7. Finally, the panel reversed the District Court's dismissal of Burrell's RICO claims because that ruling was based on dismissal of his Thirteenth Amendment and TVPA claims—the alleged predicate violations of law for RICO liability. *Id.* at 160.

On remand, Burrell obtained counsel and filed a Second Amended Complaint ("SAC"), which added Huzzard and Stuckey as plaintiffs and significantly refined its list of defendants, its factual allegations, and its legal claims. The SAC contends that conditioning plaintiffs' access to work release—which would have enabled them to earn the money they needed to secure their freedom from incarceration—on completing a period of sub-minimum-wage, dangerous, and disgusting work at a private business amounted to involuntary servitude and forced labor, in violation of the Thirteenth Amendment[4] and the TVPA, 18 U.S.C. §§ 1589, 1595;[5] that

---

[4] Plaintiffs press their Thirteenth Amendment claims via 42 U.S.C. § 1983.

[5] § 1595 creates a civil cause of action for victims of, *inter alia*, a TVPA violation, "against the perpetrator []or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter[.]" *Id.* § 1595(a). On January 5, 2023, Congress enacted the Abolish Trafficking Reauthorization Act of 2022. This amended the language in § 1595(a) to include a TVPA

defendants' violations of the TVPA as an association in fact was a pattern of racketeering activity under RICO, 18 U.S.C. § 1961(1), in violation of *id.* §§ 1962(c), 1964(c); that failure to pay them the minimum wage for their work at the Recycling Center violated FLSA's minimum wage provision, 29 U.S.C. § 206(a)(1)(c), and the Pennsylvania Minimum Wage Act, 43 Pa. Stat. and Cons. Stat. § 333.104(a.1); that paying plaintiffs' daily five dollar wage into their commissary accounts, rather than in cash or check, violated the Pennsylvania Wage Payment and Collection Law, *id.* § 260.2a; and that plaintiffs' work at the Center unjustly enriched defendants.

After briefing, the District Court granted defendants' motions to dismiss the SAC. The Court first held that the *Rooker-Feldman* doctrine did not preclude its jurisdiction over the TVPA and Thirteenth Amendment claims, so long as it did not credit plaintiffs' allegations that they could not pay their purges (payment of which would effect compliance with their contempt orders and get them out of prison). The Court then concluded that plaintiffs' Thirteenth Amendment and TVPA claims failed, because the legal requirement that the state court had to find that plaintiffs were able to pay their purges before sentencing them to incarceration for civil contempt meant that plaintiffs could have chosen to pay their purges and leave prison rather than work at the Recycling Center. The Court also dismissed plaintiffs' RICO and unjust enrichment claims because they were predicated on plaintiffs' failed Thirteenth

violation, "against the perpetrator []or whoever knowingly benefits, *or attempts or conspires to benefit*, financially . . .." *See* Pub. L. No. 117-347, 136 Stat 6199, 6200 (emphasis added).

9

Amendment and TVPA claims. The Court finally dismissed plaintiffs' FLSA, Pennsylvania Minimum Wage Act, and Pennsylvania Wage Payment and Collection Law claims because plaintiffs failed to allege an employer-employee relationship, an implied contract on wages to be paid, or a breach thereof.

Though the District Court dismissed some claims without prejudice, plaintiffs stood on their complaint and sought final judgment, which the District Court issued. Plaintiffs then timely appealed.

## II.     STANDARD OF REVIEW

Because this case arises from a motion to dismiss, we conduct a plenary review of the District Court's order granting a motion to dismiss for failure to state a claim, *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187 (3d Cir. 2009), and "accept as true the allegations of the complaint," *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 452 (2012).

## III.     DISCUSSION

### A.     *Rooker-Feldman*, Issue Preclusion, and Changed Circumstances

### 1. *Rooker-Feldman* Doctrine

"In certain circumstances, where a federal suit follows a state suit, the *Rooker–Feldman* doctrine prohibits the district court from exercising jurisdiction. The doctrine takes its name from the only two cases in which the Supreme Court has applied it to defeat federal subject-matter jurisdiction[.]" *Great*

10

*W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163–64 (3d Cir. 2010). The doctrine is narrowly confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments," and "does not otherwise override or supplant preclusion doctrine." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

"If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id.* at 293. That distinction has consequences: "*Rooker-Feldman*, unlike claim and issue preclusion, implicates a federal court's subject-matter jurisdiction, meaning it cannot be forfeited or waived, and courts must evaluate its applicability *sua sponte* if it is a concern." *Vuyanich v. Smithton Borough*, 5 F.4th 379, 385 (3d Cir. 2021) (cleaned up).

Plaintiffs assert "that they had no option but to work at the Center" and Burrell asserts "that he did not have the ability to pay \$2,129.43"—his purge amount. App. 62. Whether the purge orders preclude us from entertaining those assertions is a question subsidiary to plaintiffs' claims. And the "ability to pay" determination in the state court was merely a step towards the state court orders' ultimate purpose of ordering plaintiffs incarcerated to coerce their payment of overdue child support. As plaintiffs' claims may deny conclusions reached by the state court, but do not require review and rejection of the orders in which those conclusions were reached, *Rooker-Feldman* does

11

not thwart federal jurisdiction. *See Exxon Mobil Corp.*, 544 U.S. at 293.

## 2. Issue Preclusion

The purge orders implicate issue preclusion, which is not a jurisdictional matter but instead an affirmative defense. *See* Fed. R. Civ. P. 8(c). Plaintiffs correctly point out that issue preclusion "has not yet been raised in this case." Pls.' Reply Br. at 4–5 n.1. But they "do not challenge the state-court ability-to-pay finding," *id.*, the only state court determination relevant to plaintiffs' claims. Instead, plaintiffs contend that they "allege injuries caused by events occurring *after* the state-court orders—their ever-worsening financial circumstances and Defendants' exploitation of them," and that their "financial insecurity increased once detained." Pls.' Br. at 16–17. The state court purge orders' ability-to-pay findings were limited by law to plaintiffs' respective present abilities to pay at the time the orders were entered. *See Hyle v. Hyle*, 868 A.2d 601, 605 (Pa. Super. Ct. 2005) ("[T]he trial court must set the conditions for a purge in such a way as the contemnor has the **present ability** to comply with the order.") (emphasis in original). They did not, and could not, make any predictions about plaintiffs' ability to pay in the future.

Thus, while plaintiffs have waived, and are precluded from raising, any challenge to the state court findings that they were able to pay at the time the courts imposed their incarceration and purge orders, they are not precluded from contending that they were, at the time of their injuries, when faced with the "community service" scheme at issue here, unable to pay.

12

### 3. Changed Circumstances

The District Court, in dismissing plaintiffs' Thirteenth Amendment and TVPA claims, correctly pointed out that the SAC does not allege that plaintiffs' circumstances changed between when they were each adjudged able to pay a purge amount and when they began working at the Recycling Center under what they purport was coercion. Plaintiffs, however, respond, also correctly, that they were not required to allege as much in their complaint, as such facts are required only to overcome the affirmative defense of issue preclusion, and "'[u]nder Federal Rule of Civil Procedure 8, a complaint need not anticipate or overcome affirmative defenses' to state a claim for relief and defeat a Rule 12(b)(6) motion to dismiss." Pls.' Br. at 21 (quoting *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014).

Although they do not allege changed circumstances in their complaint, the facts they do allege support no less than the inference that when faced with the choice of working at the Recycling Center, serving their contempt sentence, or paying their purge amount, plaintiffs were unable to pay. Plaintiffs allege that they worked at the Center because it was the only way they could qualify for work release, without which they could not pay their child support debt and regain their freedom. For just five dollars per day—approximately sixty-two-and-a-half cents per hour—they separated trash and recyclables on conveyor belts, frequently breaking out in skin rashes, suffering wounds from sharp pieces of glass, and vomiting from the stench of their abhorrent working conditions, which includes working in 100 degrees Fahrenheit. App. 132–33 ¶¶ 166–75. The Center provides them with unsanitary toilets that have been out of order and uncleaned for months to relieve

13

themselves and takes away their food as punishment for working too slowly. *Id.* "[E]vidence of . . . extremely poor working conditions is relevant to corroborate disputed evidence regarding the use . . . of physical or legal coercion . . . or the causal effect of such conduct." *United States v. Kozminski*, 487 U.S. 931, 952 (1988). "[N]o individual who could pay his way to freedom would choose to work in the dangerous conditions of the Recycling Center for just five dollars per day." CAC & ACLU Amicus Br. at 6. Rather, the most plausible inference for why plaintiffs chose to work at the Recycling Center was to access the work release program that would pay them enough to enable them to pay their purge and secure their freedom. Plaintiffs have thus stated plausible facts from which it can be reasonably inferred that they were, at the time of their injuries, unable to pay their purge.

The District Court also erred by requiring plaintiffs to allege why they did not request modification of their support orders in state court. The statute at issue, 23 Pa. C.S. § 4352(a.2), expressly excludes "incarceration for nonpayment of support" from "constitut[ing] a material and substantial change in circumstance that may warrant modification or termination of an order of support where the obligor lacks verifiable income or assets sufficient to enforce and collect amounts due." As plaintiffs were legally unable to have their support orders modified or terminated for changed circumstances stemming from incarceration for nonpayment of support, they need not plead otherwise.

The District Court thus erred by dismissing plaintiffs' Thirteenth Amendment and TVPA claims based on their failure to allege changed circumstances and why they did not seek modification of their support orders. That does not,

14

however, end the inquiry—plaintiffs still must state claims upon which relief can be granted.

## B.    Thirteenth Amendment

Section 1 of the Thirteenth Amendment to the Constitution of the United States states: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

In *Kozminski*, the Supreme Court held that the phrase "involuntary servitude," as used in 18 U.S.C. § 1584 and the Thirteenth Amendment, is "limited to cases involving the compulsion of services by the use or threatened use of physical or legal coercion." 487 U.S. at 948. The Court rejected the Government's broader proposed understanding of the phrase, which encompassed "the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power of choice," because that reading "would delegate to prosecutors and juries the inherently legislative task of determining what type of coercive activities are so morally reprehensible that they should be punished as crimes." *Id.* at 949.

"Modern day examples of involuntary servitude [under the Thirteenth Amendment] have been limited to labor camps, isolated religious sects, or forced confinement." *Steirer v. Bethlehem Area Sch. Dist.*, 987 F.2d 989, 999 (3d Cir. 1993). Thus, in *Zavala v. Wal Mart Stores Inc.*, where plaintiff illegal immigrants "allege[d] that they were coerced into working by

15

threats to report their immigration status to authorities," we held that "[a]bsent some special circumstances, threats of deportation are insufficient to constitute involuntary servitude."[6] 691 F.3d 527, 531, 541 (3d Cir. 2012). From *Zavala* we derive the principle that using an otherwise legal process for a purpose for which it was not created or intended to be used is not, on its own, sufficient to constitute the threat of legal sanction necessary to find a Thirteenth Amendment violation. Here, restricting access to the work release program and threatening plaintiffs with serving the entirety of their otherwise legal contempt sentences is akin to the threats of deportation in *Zavala*. Because plaintiffs do not sufficiently allege involuntary servitude, they fail to state a Thirteenth Amendment § 1983 claim on which relief can be granted, and we will affirm the District Court's dismissal of those claims.

## C.    TVPA

As to their TVPA claims, Plaintiffs allege three theories:

> 204. During all relevant times, Defendants attempted to and did obtain the labor of Plaintiffs and the Rule 23 Class through threats of continued physical restraint, specifically, by telling Debtors that if they did not work at the Center they would remain ineligible for work release, in violation of 15 U.S.C. § 1589(a)(1).

---

[6] Although *Zavala* involved a claim under 18 U.S.C. § 1584, the phrase "involuntary servitude" has the same meaning in § 1584 and the Thirteenth Amendment. *See Kozminski*, 487 U.S. at 944–45.

16

205. During all relevant times, Defendants attempted to and did obtain the labor of Plaintiffs and the Rule 23 Class through abuse of law and/or legal process, in violation of 15 U.S.C. § 1589(a)(3).

206. During all relevant times, Defendants attempted to and did obtain the labor of Plaintiffs and the Rule 23 Class by causing Debtors to believe that, if they did not provide labor at the Center, they would suffer continued physical restraint without the ability to participate in work release, in violation of 15 U.S.C. § 1589(a)(4).

App. 137.

Congress heeded the Court's call in *Kozminski* for legislative action, *see* 487 U.S. at 951–52, when it passed the TVPA, which defines forced labor broader than *Kozminski*'s definition of involuntary servitude as used in the Thirteenth Amendment by criminalizing

knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

17

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C § 1589(a). Specifically, subsections (2) and (4) draw more broadly than *Kozminski*'s limitation to "physical or legal coercion." *See also* 22 U.S.C. § 7101(b)(13) (noting, in support of the TVPA's passage, *Kozminski*'s narrow definition of involuntary servitude and stating that "[i]nvoluntary servitude statutes are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion."); H.R. Rep. No. 106-939, at 101 (2000) ("Section 1589 will provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*.").

Congress also broadly defined "abuse or threatened abuse of law or legal process" as

the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

18

18 U.S.C. § 1589(c)(1).

And Congress chose not to include the phrase "involuntary servitude" in the TVPA. Rather, the TVPA clearly encompasses a broad range of conduct which is not limited, as the dissent suggests, to 'appalling criminal conduct and shocking depravity.'" *See* Dissent Op. at n.6. That range of conduct encompasses circumstances in which the person whose labor is being exploited is faced with any number of choices as an alternative to working, including actual or threatened physical restraint, serious harm, and abuse of law or legal process. *See* 18 U.S.C. § 1589(a)*.* And the TVPA bars getting or giving labor "by any one of, or by any combination of, the [prohibited] means," indicating that a victim can face more than a binary choice and remain protected by the statute. *Id.* The TVPA's more-expansive definitions of coercion reflect the "increasingly subtle" ways by which labor may be forced, *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011), including both physical and "nonphysical forms of coercion," *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017).

Defendants' conditioning of plaintiffs' access to the work release program (which plaintiffs allege they needed to free themselves) on a period of nearly free, grueling labor at the Recycling Center, is an abuse of law or legal process under the TVPA. That is so because it is a use of the work release program in a manner for which it was not designed, in order to pressure plaintiffs to work at the Center. *Id.* at 1589(c)(1).

Plaintiffs argue that

Pennsylvania law authorizes state correctional facilities to implement and operate work-release

19

programs, which enable inmates to temporarily leave their correctional facility to work in the community. But these programs must serve several statutory purposes (and only those purposes): to promote "accountability of offenders to their community," to provide "opportunities for offenders to enhance their ability to become contributing members of the community," and to "protect society." 42 Pa. Stat. and Cons. Stat. § 9803(1)-(4). Here, the County operated its work-release program in a manner directly at odds with these purposes, manipulating the qualification standards for work-release eligibility solely to gain a pecuniary benefit.

Pls.' Br. at 31. No defendant challenges this argument. And the placement of Section 9813, "Work release or other court order and purposes," in Title 42, Chapter 98, "County Intermediate Punishment"—which also includes Section 9803, "Purpose," the Section relied on by plaintiffs—indicates that Section 9803's stated purposes govern county jail work release programs like that which plaintiffs sought to participate in here.

Section 9803 states in full:

County intermediate punishment programs shall be developed, implemented and operated for the following purposes:

(1) To protect society and promote efficiency and economy in the delivery of corrections services.

(2) To promote accountability of offenders to their local community.

(3) To fill gaps in local correctional systems and address local needs through expansion of punishment and services available to the court.

(4) To provide opportunities for offenders who demonstrate special needs to receive services which enhance their ability to become contributing members of the community.

42 Pa. Stat. and Cons. Stat. § 9803.

Again, no defendant contends that conditioning access to work release on a period of dangerous, nearly unpaid labor serves any of those purposes. Rather, the nearly free labor for most of the grunt work at a joint public/private profit-seeking operation seems to be the point. The Professional Service Operating Agreement between the Corporation and the Municipal Authority states that the "Authority shall use its best efforts to . . . provide [the Corporation] with the same number of Prisoners from the Lackawanna County Prison that have historically worked at the Center as part of their work release program as security requirements dictate." App. 150. Plaintiffs allege that "the only individuals typically performing this work are those from the Prison. The Center does not employ hourly-paid workers to regularly perform this work." App. 133 ¶ 176. And under the Operating Agreement, "the Authority shall

retain the lesser of[] all revenues or the first $60,000.00 of gross revenue." App. 148. So long as the Center brings in more than $60,000, the Corporation and the Authority share the profits earned by exploiting plaintiffs' and their purported class members' nearly free labor—labor which plaintiffs purport to have provided so as to be eligible to later access the work release program, earn real wages, pay their purges, and free themselves from civil incarceration.

That is a clear example of "the use . . . of a law or legal process . . . in a[] manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action," which the TVPA defines as an abuse of law or legal process. 18 U.S.C. § 1589(c)(1); *see id.* § 1589(a)(3) (proscribing the obtaining or providing of labor or services by means of the abuse of law or legal process); *see also United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008) ("[T]he immigration laws do not aim to help employers retain secret employees by threats of deportation, and so their 'warnings' about the consequences were directed to an end different from those envisioned by the law and were thus an abuse of the legal process. See *Restatement (Second) of Torts* § 682. The warnings therefore fit within the scope of § 1589(3)."). Of course, plaintiffs do not have an independent due process or state-created liberty interest in access to a work release program in which they have not yet been placed. *See Powell v. Weiss*, 757 F.3d 338, 342–46 (3d Cir. 2014). But they have a statutory right to be free from having their labor knowingly coerced via, *inter alia*, the abuse of law or legal process.

The TVPA also proscribes providing or obtaining labor "by any one of, or by any combination of," the proscribed

22

means. 18 U.S.C. § 1589(a). That includes (1) serious harm, such as "withholding basic necessities like food" if they did not work efficiently enough at the Recycling Center, *see Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1273 (11th Cir. 2020); (2) physical restraint, like plaintiffs allege they faced (albeit pursuant to a legal order) if they were unable to access the work release program to pay their purge; and (3) abuse of law or legal process, like conditioning access to a work release program on the furnishing of a period of nearly free labor. Plaintiffs have thus sufficiently pleaded that their labor was provided and obtained by a combination of means prohibited by the TVPA, 18 U.S.C. § 1589.

Several defendants also contest whether they, specifically, can be held liable. The Authority first argues that

> Child Support Debtors offend the intent and purpose of the TVPA by essentially analogizing their situations to the serious cases of physical and sexual exploitation of trafficked woman and children intended to be protected by the act. Child Support Debtors were lawfully sentenced to a term of imprisonment where eligibility for traditional work release was lawfully conditioned upon community service. Court ordered Community service is not human trafficking, and the TVPA was never intended to criminalize or impose liability upon governmental, municipal, and private entities and individuals who either offer inmates the opportunity to complete community service or provide a means to actually complete community service.

Auth Br. at 21–22.

But despite its legislative history, the TVPA is not limited to "serious cases of physical and sexual exploitation of trafficked woman and children." *Id.* Rather, it applies to "[w]hoever" falls within the reach of its plain text. 18 U.S.C. § 1589; *see Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 539 (5th Cir. 2021) (cleaned up) (holding that § 1589(a) applies to a federally regulated work program in a privately operated federal immigration detention facility because "legislative history cannot muddy the meaning of clear statutory language"); *Barrientos*, 951 F.3d at 1276–77 (same). Just because the County and its Municipal Authority purport to operate community service and work release programs in compliance with Pennsylvania law does not mean that they are precluded from liability for those programs' TVPA violations.

The Authority and the Corporation's contentions that their alleged conduct was not proscribed by the TVPA similarly fail. The TVPA subjects to liability not only "[w]hoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the" proscribed means, but also "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the [proscribed] means . . . , knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means." 18 U.S.C. § 1589(a), (b). Plaintiffs argue that at minimum, they have plausibly alleged a beneficiary/venture claim as to the Authority, the Corporation, and the DeNaples brothers.

24

The alleged venture starts with the County's policy requiring child support debtor contemnors to work half of their sentences at the Corporation if they want to qualify for work release—which plaintiffs contend they depend on to earn money to free themselves from physical restraint in the form of civil contempt incarceration. That is an abuse of law or legal process as defined by the TVPA.

The County provides the debtors' labor to the Corporation via the Operating Agreement between the County's Municipal Authority and the Corporation, which states that the "Authority shall use its best efforts to . . . provide [the Center] with the same number of Prisoners from the Lackawanna County Prison that have historically worked at the Center as part of their work release program as security requirements dictate." App. 150. Plaintiffs sufficiently allege that the Authority and the Corporation, as parties to the contract, knowingly benefited from its provisions, including the providing of debtors' labor to the Corporation. *See* App. 134 ¶¶ 183–84 (allegations about reduced operating costs benefitting venture defendants).

Plaintiffs also state sufficient facts supporting the reasonable inference that the Authority and the Corporation knew or should have known that the venture used prohibited means to obtain or provide labor. Plaintiffs allege extremely poor working conditions and direct on-site supervision by County and Corporation employees. *See Kozminski*, 487 U.S. at 952 (stating that "extremely poor working conditions are relevant to . . . the use or threatened use of physical or legal coercion, the defendant's intention in using such means, or the

25

casual effect of such conduct.").[7] It is quite plausible to infer from those facts that it was apparent to those employees overseeing plaintiffs' work that "no individual who could pay his way to freedom would choose to work in the dangerous conditions of the Recycling Center for just five dollars per day." CAC & ACLU Amicus Br. at 6. Thus, plaintiffs have stated facts supporting the plausible inference that the Corporation should have known that those prisoners working at the Center, including plaintiffs, were made to do so by prohibited means.

And though the County Municipal Authority did not directly oversee plaintiffs' labor at the Center, the facts alleged suggest the inference that it knew about the venture's use of prohibited labor. The Authority is the party that contracted to provide prison labor to the Corporation. As the provider of the prisoners, it is reasonable to infer that the Authority knew that "a significant number of the prisoners supplied by the Authority to LRCI for work at the Center have been placed in the Prison following civil contempt proceedings for failure to pay child support." App. 130 ¶ 145. And additionally it can be

_____

[7] The dissent's description of Plaintiffs' working conditions as "colorful descriptions of 'sorting through trash'" and "dirty, difficult, and demanding" work fails to accurately reflect what Plaintiffs' allege has occurred. One can celebrate and recognize the importance of blue-collar jobs and also point out working conditions that most workers would find repugnant and would serve as the basis for a TVPA claim—i.e., getting paid less than six dollars per day, having your meals taken away if you do not work hard enough, lacking protective equipment or failing to have basic sanitary items like a functioning toilet.

inferred—from several of the Authority's obligations in the Operating Agreement, including to "(1) cooperate with Operator in effectuating the transition by providing a transition team to meet with Operator to plan the transition; (2) provide any and all necessary books and records, customer lists, vendor lists, sale invoices, purchase invoices, payroll records, etc.[; and] (3) provide Operator with the same number of Prisoners from the Lackawanna County Prison that have historically worked at the Center as part of their work release program"—that before the Corporation agreed to operate the Center, the Authority itself operated the Center primarily with prison labor. App. 150. There is no reason to think that the disgusting and dangerous nature of the work at the Center was any different before the Corporation took control. Plaintiffs have alleged sufficient factual matter to support the reasonable inference that the Authority knew that plaintiffs' (and other contemnors') work at the Center was obtained and provided by means prohibited by the TVPA—that is, threat of physical restraint and abuse of law or legal process. Thus, plaintiffs have stated a TVPA claim as to the County, the Authority, and the Corporation.

The claims as to the DeNaples brothers are more tenuous. Plaintiffs state plausible facts alleging that the DeNaples brothers benefitted from and participated in the venture and generally allege that "Defendants were aware of Debtors' work at the Center," App. 134 ¶ 181, but they do not state any facts supporting that general conclusion, nor from which the conclusion could be reasonably inferred. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686–87 (2009) ("Rule 8 does not empower respondent to plead the bare elements of his cause

27

of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss.").[8]

Accordingly, plaintiffs' TVPA claims against the County, the Authority, and the Corporation should not have been dismissed, but dismissal of their TVPA claims against the DeNaples brothers was appropriate.

## D. RICO

The RICO Act, 18 U.S.C. § 1962(c), states that

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section 1961(1) defines "racketeering activity" to include "any act which is indictable under any of the following provisions of title 18, United States Code: . . . sections 1581-1592 (relating to peonage, slavery, and trafficking in persons)." And

---

[8] As stated in footnote five, Congress amended the TVPA on January 5, 2023. *See* Pub. L. No. 117-347, 136 Stat 6199, 6200. The 2023 TVPA amendment adds civil liability for anyone who "attempts or conspires to benefit" from a TVPA violation. Even if this applies retroactively, it neither alters the requirement that the defendant "knew or should have known" that the venture violated the TVPA nor our conclusion that pleadings as to the DeNaples brothers fail for this reason.

§ 1964(c) provides a civil remedy for "[a]ny person injured in his business or property by reason of a violation of section 1962."

The SAC alleges that all defendants violated RICO by way of their alleged TVPA violations. The District Court dismissed the RICO claims against the Corporation because it found plaintiffs failed to plausibly allege a predicate TVPA violation. And the Court dismissed the RICO claims against the DeNaples brothers because the facts alleged in the SAC "are not sufficient to establish that Louis and Dominick DeNaples personally—separate and apart from their roles as corporate officers—'conducted or participated in the conduct of the enterprise's affairs, not just their own affairs.'" App. 66–67 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001)).

We agree that plaintiffs' RICO claims against the DeNaples brothers fail, but for a different reason—because plaintiffs' predicate TVPA claims against them fail. However, plaintiffs' RICO claims against the Corporation survive. The Corporation contends that plaintiffs have failed to allege that the Corporation engaged in the alleged TVPA violations. But, for the same reason that plaintiffs have sufficiently alleged predicate TVPA venture liability as to the Corporation, they have sufficiently alleged predicate RICO liability as to the Corporation. The allusion to an argument that TVPA venture liability is not a predicate RICO offense has no basis in law. And the Corporation contracting for, and allegedly overseeing, plaintiffs' labor, in order to operate the Recycling Center for its and the County/Authority's profit, indicates that the Corporation "participated in the 'operation or management'" of the RICO enterprise—here, the same as the TVPA venture

29

described above—"through a pattern of racketeering activity." *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 372 (3d Cir. 2010).

### E. FLSA & Pennsylvania Minimum Wage Act

Plaintiffs contend that the Recycling Center, the County, and the Authority violated the FLSA's minimum wage protections, 29 U.S.C. § 206(a)(1)(C), and the Pennsylvania Minimum Wage Act, 43 Pa. Stat. and Cons. Stat. § 333.104(a.1),[9] by paying plaintiffs sixty-three cents an hour to work at the Recycling Center.

The District Court disagreed, relying on the D.C. Circuit Court of Appeals' rule

> that a prerequisite to finding that an inmate has "employee" status under the FLSA is that the prisoner has freely contracted with a non-prison employer to sell his labor. Under this analysis, where an inmate participates in a non-obligatory work release program in which he is paid by an outside employer, he may be able to state a claim under the FLSA for compensation at the minimum wage. However, where the inmate's labor is compelled and/or where any compensation he receives is set and paid by his custodian, the prisoner is barred from asserting a

---

[9] This analysis also applies to plaintiffs' Pennsylvania Minimum Wage Act claims. *See Commonwealth v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003).

> claim under the FLSA, since he is definitively not an "employee." At the pleading stage, this means that a federal prisoner seeking to state a claim under the FLSA must allege that his work was performed without legal compulsion and that his compensation was set and paid by a source other than the Bureau of Prisons itself. Absent such allegations, prison labor is presumptively not "employment" and thus does not fall within the ambit of the FLSA.

*Henthorn v. Dep't of Navy*, 29 F.3d 682, 686–87 (D.C. Cir. 1994). The Court held that plaintiffs' FLSA claims failed this test (1) because plaintiffs alleged that their labor was compelled, and thus it could not be voluntary—despite the Court previously discrediting plaintiffs' allegations of compulsion in order to dismiss their TVPA and Thirteenth Amendment claims[10]—and (2) because plaintiffs alleged that

---

[10] In order to conclude that plaintiffs had not sufficiently alleged that their work was voluntary, the District Court handwaved its earlier discrediting of plaintiffs' claims of compulsion and concluded that they had voluntarily chosen to work. But if the Court found implausible plaintiffs' allegations that their work was involuntary, then it had decided their work was voluntary, and could not dismiss their FLSA claims for failure to sufficiently allege voluntariness.

As the Recycling Center acknowledges, parties "can plead facts in the alternative, and under Fed. R. Civ. P. 8, a party may state as many separate claims or defenses as it has, regardless of consistency." Corp. Br. at 28 n.13. And it is true that plaintiffs cannot assert contradictory factual allegations

31

the Authority and the County, the latter of which was their jailer, set their pay. We will reverse, because plaintiffs have alleged sufficient plausible facts to state a claim that they are employees and that the County, its Municipal Authority, and the Corporation are their joint employers.

### 1. Joint Employment

The FLSA's minimum wage provisions apply to those that fall under the statutory definition of "employees" and "employers." 29 U.S.C. § 206. The FLSA defines "employee" as "any individual employed by an employer," "employ" as "to suffer or permit to work," and "employer" as any "person," which encompasses an "individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons" acting "directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(a), (d), (e)(1), (g).

---

that are not legitimately in doubt. *See id.* But whether plaintiffs' work was involuntary is not a fact; it is a mixed question of law and fact which is so in doubt that the District Court already denied it. The Court cannot then turn around and say plaintiffs did not allege the very thing the Court concluded had to be true—that plaintiffs' work was voluntary.

Of course, plaintiffs cannot prevail on the merits on both their TVPA claims, which require some degree of involuntary work, and their FLSA claims, which require that they worked voluntarily. But that does not bar plaintiffs from presenting both theories to a factfinder who can conclude whether the facts prove that plaintiffs' work was voluntary or involuntary.

The FLSA defines employer and employee broadly "and with 'striking breadth.'" *In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 467 (3d Cir. 2012) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985) ("Congress and the courts have both recognized that, of all the acts of social legislation, the Fair Labor Standards Act has the broadest definition of 'employee.'"). That is because the FLSA "is part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted." *Brock v. Richardson*, 812 F.2d 121, 123 (3d Cir. 1987). "The Supreme Court has even gone so far as to acknowledge that the FLSA's definition of an employer is 'the broadest definition that has ever been included in any one act.'" *In re Enter. Litig.*, 683 F.3d at 467–68 (quoting *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945)). Moreover, circuit courts have consistently held that prisoners as a class are not exempted from FLSA coverage. *Henthorn*, 29 F.3d at 685 (citing *Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992)). Congress has laid out "an extensive list of workers who are exempted from FLSA coverage" that does not include prisoners, so it would be an "encroachment upon legislative prerogative for a court to hold that a class of unlisted workers is excluded from the Act." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 13 (2d Cir. 1984). FLSA coverage is a highly factual inquiry that requires consideration of "the circumstances of the whole activity . . . rather than any one particular factor." *DialAmerica Mktg.*, 757 F.2d at 1382 (citing *Rutherford Food Corp.*, 331 U.S. at 730). Accordingly, the FLSA employer/employee determinations must be made in light of the "economic reality" of the parties' relationship. *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961).

In *In re Enterprise Litigation*, this Court set out the test for whether a defendant is a joint employer. "[D]oes the alleged employer have: (1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like." 683 F.3d at 469. The Court "emphasize[d], however, that these factors *do not constitute an exhaustive list* of all potentially relevant facts, and should not be blindly applied." *Id.* (emphasis in original) (cleaned up). We continued that "courts should not be confined to narrow legalistic definitions and must instead consider all the relevant evidence, including evidence that does not fall neatly within one of the above factors." *Id.* (cleaned up). And we noted that

> this is consistent with the FLSA regulations regarding joint employment, which state that a joint employment relationship will generally be considered to exist where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with another employer.

*Id.* at 468 (cleaned up).

In *Tourscher v. McCullough*, we held that both pre-trial and convicted inmates are "not entitled to minimum wages

34

under the FLSA" for "intra-prison work." 184 F.3d 236, 243–44 (3d Cir. 1999). To reach that conclusion as to convicted inmates, we agreed with the ten other circuits that had addressed the question and quoted analysis from the Second Circuit Court of Appeals: "The relationship is not one of employment; prisoners are taken out of the national economy; prison work is often designed to train and rehabilitate; prisoners' living standards are determined by what the prison provides; and most such labor does not compete with private employers." *Danneskjold v. Hausrath*, 82 F.3d 37, 42 (2d Cir. 1996). And we extended that rationale to pre-trial detainees by relying on analysis from the Eleventh Circuit Court of Appeals that

> The purpose of the FLSA is to protect the standard of living and general well-being of the American worker. Because the correctional facility meets [plaintiff's] needs, his standard of living is protected. In sum . . . [plaintiff]'s situation does not bear any indicia of traditional free-market employment contemplated under the FLSA.

*Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997) (cleaned up).

Plaintiffs' work, however, was not the sort of "intra-prison work" for which inmates are categorically "not entitled to minimum wages under the FLSA." *Tourscher*, 184 F.3d at 243–44. The Recycling Center is located at an off-site facility to which plaintiffs and their purported class members were transported by County jail guards. The facility is owned by the County Municipal Authority and operated, for the most part,

35

by the Corporation, pursuant to an Operating Agreement between the Authority and the Corporation. Plaintiffs' off-site work, not done for the benefit of the jail but rather for the benefit of the public-private partnership between the Municipal Authority and the Recycling Center, is markedly different than inmates doing work within a facility "producing goods and services used by the prison" (like plaintiff in *Tourscher*'s work in the prison cafeteria).

The *Tourscher*, *Danneskjold*, and *Villarreal* opinions are limited to intra-prison labor, and each acknowledge and distinguish the Fifth Circuit Court of Appeals' opinion in *Watson v. Graves*, which held that the FLSA applied to convicted inmates allowed to work for a private construction company outside of the jail. 909 F.2d 1549, 1553–56 (5th Cir. 1990). *Watson* applied the traditional four-factor economic reality test originated by the Ninth Circuit Court of Appeals in *Bonnette v. California Health and Welfare Agency*, which is slightly less detailed than our *Enterprise* test: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." 704 F.2d 1465, 1470.

By contrast, the D.C. Circuit Court of Appeals in *Henthorn* declined to apply the *Bonnette* test to incarcerated people at all and rejected the relevance of whether they work inside or outside of the prison or for public or private employers, instead asking whether (1) an inmate's labor is compelled or voluntary and (2) their wages are set and paid by their custodian or an outside employer. 29 F.3d at 685–87. The plaintiff in *Henthorn* was a convicted federal prisoner,

36

incarcerated at a federal prison on a naval base, and assigned to work on the grounds of the base outside of the prison. *Id.* at 683. The D.C. Circuit did not apply the traditional *Bonnette* economic reality test because "the prisoner is legally compelled to part with his labor as part of a penological work assignment" and "is truly an involuntary servant to whom no compensation is actually owed." *Id.* at 686 (citing *Vanskike*, 974 F.2d at 809 ("Thirteenth Amendment's specific exclusion of prisoner labor supports the idea that a prisoner performing required work for the prison is actually engaged in involuntary servitude, not employment.") and *Wilks v. District of Columbia*, 721 F. Supp. 1383, 1384 (D.D.C. 1989) (convicted "inmate labor belongs to the penal institution and inmates do not lose their primary status as inmates just because they perform work")).

As a preliminary matter, none of those cases involve non-convicted inmates like plaintiffs here. And the *Henthorn* test's muddled application to this case proves it too narrow and rigid to serve the FLSA's purposes.

As to the first factor, plaintiffs allege that their work was coerced, but as defendants argue, plaintiffs chose to work at the Recycling Center rather than merely complete their contempt sentences. Plaintiffs' work, as alleged, sits on a razor-thin line between involuntary and voluntary, and whether it falls to either side should be decided on the facts. And no one can say that not convicted plaintiffs' work belongs to the County or that the Thirteenth Amendment excludes their labor from the prohibition on involuntary servitude.

The second factor—does the custodian or a private party set and provide pay?—is similarly unclear. Plaintiffs

37

allege that the County and its Municipal Authority set inmate pay. While the County alone setting plaintiffs' pay may seem to weigh in favor of finding that they were not employees (because the County was plaintiffs' custodian), that is complicated in a case like this, where the County and its Municipal Authority financially benefitted from plaintiffs' labor. Further, plaintiffs are silent as to who actually paid them, and the County Municipal Authority seems to contend in its briefing that the Recycling Center paid them. *See* Auth. Br. at 17 ("The Authority did not set or pay any employee wages to either inmates completing community service at the recycling center or standard employees directly hired to work at the recycling center. All wages and compensation were managed and paid by the Center, out of its own contractual consideration."). And even if the County set and provided plaintiffs' pay, it did so in furtherance of its business relationship with the Recycling Center Corporation, with whom it operated the Center as a joint public-private venture (through the auspices of the Municipal Authority), to whom it contracted out plaintiffs' work as off-site sub-minimum wage labor, and who plaintiffs allege jointly controlled plaintiffs' work along with County jail guards. There is a real difference in the economic relationships at play when a custodial jurisdiction receives an economic benefit for its not convicted wards' work.

Application of the *Enterprise* test proves far more useful. Plaintiffs allege the following facts relevant to the *Enterprise* factors:

> 133. Pursuant to the Operating Agreement, County personnel select Debtors to work at the Center.

134. Upon information and belief, County personnel and LRCI personnel have authority to terminate Debtors from their assignments at the Center.

135. Defendants LRCI and the Authority jointly determine work rules and assignments.

136. Defendants LRCI, the County, and the Authority jointly determine the days and hours during which Debtors will work at the Center.

137. County personnel – specifically, prison guards – transport Debtors to the Center consistent with agreed-upon work schedules.

138. The prison guards remain on site at the Center to supervise Debtors and ensure security.

139. The prison guards and Center employees jointly supervise Debtors' work at the Center, including but not limited to ensuring that prisoners working on the line worked quickly.

140. If prisoners on the line did not move quickly enough or failed to remove all the glass from the conveyor belt, the prison guards or Center staff punished them by, for example, omitting portions of their prison-provided lunch.

141. Staff at the Center direct Debtors' work, including but not limited to assigning them to workstations, instructing them how to perform their tasks, and authorizing them to take breaks.

142. The Authority and the County set Debtors' pay at $5 per day.

143. Under the terms of the Operating Agreement, LRCI has the authority to set the rates of compensation of any employees of the Center.

App. 129–30 ¶¶ 133–43. These all indicate plaintiffs' joint employment by the County, its Municipal Authority, and the Corporation.

Also relevant to the economic reality of plaintiffs' relationships with the County, the Municipal Authority, and the Corporation, is the fact that the County and Authority contracted out plaintiffs' work to the Corporation for a joint economic benefit. Plaintiffs and their cohort did the facility's integral and necessary grunt work of hand-sorting garbage in lieu of the Corporation employing hourly-paid workers. That work "benefited Defendants by reducing the need for paid employees and artificially reducing their labor costs through access to a steady supply of sub-market rate labor for which Defendants did not provide unemployment and health insurance, worker's compensation, minimum wages, and/or overtime premiums." App. 138 ¶ 217. That is true as to the County, which had custody of plaintiffs and provided their labor, and its Municipal Authority, which owned the facility out of which the Recycling Center ran and shared the profits that resulted from its operation. It is also true for the Corporation, which contracted with the County's Municipal Authority to run the Recycling Center. Pursuant to the Operating Agreement between the Recycling Center and the Authority, the "Authority shall use its best efforts to . . . provide

[the Center] with the same number of Prisoners from the Lackawanna County Prison that have historically worked at the Center as part of their work release program as security requirements dictate." App. 150. As such, the Recycling Center relied on plaintiffs and other inmates to do work that other recycling facilities had to hire people to do.

The economic reality of plaintiffs' relationship with the County, its Municipal Waste Management Authority, and the Corporation is only truly understood by looking at *all* of those facts, which resemble an employee-joint employer relationship far more than the typical forced prison work program.

> The purposes underlying the FLSA bolster our conclusion. "The central aim of the Act was to achieve, in those industries within its scope, certain minimum labor standards." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960). Congress sought to correct labor conditions that are "detrimental to the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). In addition, the FLSA was intended to prevent unfair competition in commerce from the use of underpaid labor. 29 U.S.C. § 202(a)(3).

*Vanskike*, 974 F.2d at 810.

While plaintiffs' basic needs were provided for by Lackawanna County, plaintiffs allege that they were only incarcerated because they were unable to pay their purges.

41

They needed money for a reason that the typical incarcerated person does not: to satisfy their contempt orders and secure their freedom from incarceration. Thus, while courts may conclude that typical prisoners do not need a minimum wage because they are fed and housed by the state, plaintiffs here had a concrete, important financial objective that they contend was the reason they worked at the Center. And as to competition in commerce, the Corporation here surely competed with other local and regional recycling facilities who had to hire employees; the Corporation, on the other hand, got an unfair advantage in the form of nearly free labor funneled from its business partner, the County—who stood to profit from the Corporation's success. Plaintiffs' work at the Center mirrors the work in *Watson*, where the defendant had access to a "pool of workers" whom he paid "token wages" far below the minimum wage, and "incurred no expenses for overtime, unemployment insurance, social security," etc. and did not need to worry about competition. *Watson*, 909 F.2d at 1555. The situations in *Watson* and here are "the very problems that FLSA was drafted to prevent—grossly unfair competition among employers and employees alike." *Id.*

We are not persuaded that the passage of the Ashurst-Sumners Act of 1935, *see* 18 U.S.C. §§ 1761–62, is reason to preclude from FLSA protection prisoners who partake in labor outside prison walls and who perform labor that does not benefit the prison. While the Ashurst-Sumners Act "regulates the interstate transportation of prison-made goods to avoid competition between low-cost prison labor and free labor," *Danneskjold*, 82 F.3d at 42, "prison labor might implicate unfair-competition concerns when prisoners are paid below minimum wage to work for 'a company that was not providing services to the prison and that competed with companies

required to pay wages set by the FLSA.'" *Gamble v. Minnesota State-Operated Servs.*, 32 F.4th 666, 671 (8th Cir. 2022) (quoting *Danneskjold*, 82 F.3d at 44). That is arguably the situation at hand. As stated above, the Corporation competed with other recycling facilities that had to hire employees and did not get the benefit of nearly free labor. Plaintiffs' work was done off-site and for the benefit of a public-private partnership, unlike in *Harker* where the prisoners worked at a workshop located in the prison and produced goods that reached the open market in limited ways. *See Harker v. State Indus.*, 990 F.2d 131, 136 (4th Cir. 1993). Plaintiffs' work was also not that of an inmate performing work assignments, such as janitor or kitchen worker, directly for the benefit of the prison. *See Vanskike*, 974 F.2d at 812. Here, the benefits of Plaintiffs' labor do not redound to the prison. The existence of the Ashurst-Sumners Act does not cause us to ignore the stark differences between work done for the prison's benefit and outside work done at least partially to benefit a private corporation.

Plaintiffs thus sufficiently allege that, while working at the Center, they were the employees of the County, the Authority, and the Corporation, acting as joint employers.

## 2. Statute of Limitations

The Corporation also argues that Burrell and Huzzard's claims are barred by the FLSA's statute of limitations, as their violations occurred in 2014 and 2013, respectively, and they did not raise their FLSA claims when plaintiffs filed their Second Amended Complaint in 2019.

43

Plaintiffs contend that the statute of limitations should be equitably tolled because defendants failed to conspicuously post required notices to alert them to their rights as employees and "actively misled Plaintiffs and members of the FLSA Collective regarding the nature of their relationship with Defendants by suggesting to them that they were not employees with rights but rather prisoners whom Defendants could force to perform work as punishment and as a condition of their liberty," and "[t]hese actions prevented Plaintiffs and those similarly situated from understanding that they had a right to federal minimum wage during the time they worked at the Center." App. 127 ¶¶ 118–119.

While we have not decided whether an employer's failure to post required FLSA notices, by itself, tolls the statute of limitations, at least one other Court of Appeals has. *See Cruz v. Maypa*, 773 F.3d 138, 146–47 (4th Cir. 2014). In *Cruz*, the Fourth Circuit Court of Appeals extended its prior precedent—holding "that the 180–day filing requirement of the Age Discrimination in Employment Act ("ADEA") was tolled by reason of the plaintiff's employer's failure to post statutory notice of workers' rights under the Act"—to the FLSA context, because "the notice requirements in the ADEA and the FLSA," and their purposes, "are almost identical," and, unlike the ADEA, the FLSA lacks an administrative filing requirement. *Id.* (citing *Vance v. Whirlpool Corp.*, 716 F.2d 1010 (4th Cir. 1983)). We have held the same in the ADEA context, and a panel of our Court applied that holding in the Title VII context. *See Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 193 (3d Cir. 1977); *Hammer v. Cardio Med. Prods., Inc.*, 131 F. App'x 829, 831–32 (3d Cir. 2005). And we need not categorically conclude that failure to post notices is itself sufficient to equitably toll the limitations period. Plaintiffs here allege

more: that defendants actively misled them by failing to post notices and telling them that they were not employees with rights but rather prisoners who could be forced to work for below the minimum wage. App. 126–27 ¶¶ 117–118. These allegations amount to "active misleading" such that equitable tolling applies. *See Hedges v. United States*, 404 F.3d 744, 751 (3d Cir. 2005).[11]

Accordingly, plaintiffs' FLSA claims against the County, the Authority, and the Corporation are not barred by the statute of limitations.

### F.     Pennsylvania Wage Payment and Collection Law

The Pennsylvania Wage Payment and Collection Law requires employers to pay employees their promised wages "in lawful money of the United States or check." 43 Pa. Stat. § 260.3(a). That requirement is not waivable. *Id.* § 260.7. The law "does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract

---

[11] Additionally, Burrell's FLSA claim relates back to the filing of his First Amended Complaint. His FLSA claim in the Second Amended Complaint "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Burrell's *pro se* First Amended Complaint alleges that he was paid far below the minimum wage to work full days at the Center, and that he was told he could be treated as such because he was a prisoner. With regard to his FLSA claim in the SAC, that satisfies Fed. R. Civ. P. 15(c)(1)(B).

between the parties governs in determining whether specific wages are earned." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990).

The District Court first held that the law did not apply to plaintiffs based on its earlier conclusion that there was not an employer-employee relationship in the FLSA context. But it also held that even if there was, plaintiff failed to allege an implied contract or a breach thereof. The Court noted that while Burrell alleged he was told by prison staff that he would receive $5.00 a day for working at the Center, Huzzard and Stuckey did not allege that they were told as much, "only that they in fact received $5.00 a day and those payments were deposited in their commissary accounts." App. 82. It then extrapolated from those facts the conclusion that "[t]he Second Amended Complaint contains no allegation that a person acting with the authority to speak for any Defendant established that Plaintiffs would be paid $5.00 for their services. Thus, the Court cannot infer from the Second Amended Complaint that the parties 'agreed on the obligation to be incurred.'" App. 83 (quoting *Oxner v. Clivedon Nursing & Rehab. Ctr. PA, L.P.*, 132 F. Supp. 3d 645, 649 (E.D. Pa. 2015)) (cleaned up).

But the District Court's conclusion ignores its own acknowledgment that Burrell alleged that County prison staff—who presumably have the authority to speak for the County—told him that he would be paid $5.00 a day for his work at the Center. That directly contradicts the inference that plaintiffs fail to allege that anyone "acting with the authority to speak for any Defendant established that Plaintiffs would be paid $5.00 for their services." App. 83. That is exactly what Burrell has alleged.

46

And it is no far stretch to identify an implied agreement. Plaintiffs allege that "[t]he Authority and the County set Debtors' pay at $5 per day." App. 130 ¶ 142. Further, as the Authority points out in its brief, 37 Pa. Code § 95.235(3) states that "[w]ritten local policy must require that inmates who participate in a work program (other than personal housekeeping and housing area cleaning) receive compensation. Written local policy must specify the type and amount of compensation." As plaintiffs allege that the County determined what plaintiffs would be paid for their services, and by law the County must specify that amount in a written policy, plaintiffs allege sufficient facts from which it can be reasonably implied that the County's written policy informed plaintiffs that they would be paid $5.00 a day for their work at the Center, which they then gave in exchange for that money.

The problems with plaintiffs' claims, however, are more fundamental. The crux of their claims is that "[p]ayment into the commissary accounts is not equivalent to payment by lawful money of the United States or check. Commissary accounts, among other things, earn no interest, are tightly controlled by the Prison, and are subject to various mandatory deductions by the Prison." App. 131–32 ¶ 160. But cash and checks, on their own, earn no interest either. Cash and checks are also presumably contraband within the prison, which justifies depositing plaintiffs' pay into their commissary accounts, just as cash and checks would be deposited. And plaintiffs do not allege specific deductions that they contend made payment into their commissary accounts different than "lawful money." Plaintiffs thus fail to state Pennsylvania Wage Payment and Collection Law claims.

47

## G.     Unjust Enrichment

The District Court dismissed plaintiffs' unjust enrichment claim because it was pleaded as a companion to plaintiffs' forced labor and involuntary servitude claims, and where the unjust enrichment claim rests on the same improper conduct as the underlying tort claim, the unjust enrichment claim will rise or fall with the underlying claim. As plaintiffs' TVPA claims survive against the County, the Authority, and the Corporation, so do their unjust enrichment claims.

Further, plaintiffs contend that they "plausibly alleged the three elements of an unjust enrichment claim, independent from their TVPA and Thirteenth Amendment claims." Pls.' Br. at 53. Those three elements are (1) conferring a benefit on defendant; (2) defendant's knowledge of the benefit; and (3) circumstances are such that defendant's retention of that benefit would be unjust. *See Allegheny Gen. Hosp. v. Philip Morris,* 228 F.3d 429, 447 (3d Cir. 2000). They allege that they conferred the benefits of their labor by working at the Center and the resulting lower operating costs on all defendants. They allege all defendants knowingly obtained those benefits. And they allege that defendants' retention of those benefits was not only unjust because it was the result of plaintiffs' unlawfully forced labor, but because Defendants got those benefits "from an unfair competitive advantage by paying subminimum wages into commissary accounts they tightly control." Pls.' Br. at 54. That species of unjust enrichment is more akin to a contract claim than a tort claim, and rises and falls with their FLSA claims rather than their TVPA claims.

As plaintiffs plausibly allege that the County, its Municipal Authority, and the Corporation unjustly retained the

48

yield of their labor, whether by way of a TVPA violation or a FLSA violation, plaintiffs' unjust enrichment claims on both theories survive against those defendants.

## IV.     CONCLUSION

For the foregoing reasons, we will affirm dismissal of plaintiffs' Thirteenth Amendment and Pennsylvania Wage Payment and Collection Law claims in full, and of their TVPA and RICO claims against the DeNaples brothers. We will reverse dismissal of their TVPA, FLSA, Pennsylvania Minimum Wage Act, and unjust enrichment claims against the County, the Authority, and the Corporation, and of their RICO claims against the Corporation and remand.

MATEY, *Circuit Judge*, concurring in part and dissenting in part.

Choices usually come with consequences. We can honor our obligations, pursue opportunity, make good on our debts. Or we can walk the other way and decline to play by the rules. Ordinarily, law fences these two paths, rewarding industry and honesty, penalizing irresponsibility. The majority's decision moves that line. While I agree Plaintiffs fail to state claims under the original meaning of the Thirteenth Amendment[1] and the Pennsylvania Wage Payment and

---

[1] After an abhorrent chapter in our Nation's history, the Thirteenth Amendment confirmed the natural rights of all persons through "a practical application of that self-evident truth, 'that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty and the pursuit of happiness.'" Jacobus tenBroek, *Thirteenth Amendment to the Constitution of the United States: Consummation to Abolition and Key to the Fourteenth Amendment*, 39 Calif. L. Rev. 171, 178 (1951) (quoting Cong. Globe, 38th Cong., 2d Sess. 142 (1865) (statement of Rep. Godlove S. Orth)). The Amendment reiterated the natural law that supports our Constitution, making slavery irreconcilable "with the fundamental principles upon which our government rests." Joel Tiffany, *A Treatise on the Unconstitutionality of American Slavery* (1849), *reprinted in* 2 The Reconstruction Amendments: The Essential Documents 237, 237–38 (Kurt T. Lash ed., 2021) ("All men are possessed of the same natural rights, secured by the same natural guarantys—held by the same tenure—their title is derived from the same source. . . . Deny these truths, and you destroy the foundation upon which society is based. Violate

them, and you are at war with yourself, with Man and God."). The Amendment, rooted in "our ancient faith [that] the just powers of governments are derived from the consent of the governed," recognized that slavery's existence was "a total violation of this principle . . . [of] self government." Abraham Lincoln, Speech at Peoria, Illinois (Oct. 16, 1854), *reprinted in* 2 The Collected Works of Abraham Lincoln 247, 265–66 (Roy Basler ed., 1953). "By the law of nature all men are born free and equal, and man has no *jus dominii* in man. . . . [F]or freedom is the natural right of every man, and slavery is abridgment by positive law." *Slavery and the Incoming Administration*, *in* 2 Brownson's Quarterly Review 65, 109 (1857). *See also Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 624 (1857) (Curtis, J., dissenting) ("Slavery, being contrary to natural right, is created only by municipal law."). The Thirteenth Amendment codified the truth that slavery could be treated as constitutional "only by disregarding the plain and common-sense reading of the Constitution itself." Frederick Douglass, *The Constitution of the United States: Is It Pro-Slavery or Anti-Slavery?* (1860), *reprinted in* 2 The Reconstruction Amendments: The Essential Documents 303, 308. *See also* Peter C. Myers, *Seed-Time and Harvest-Time: Natural Law and Rational Hopefulness in Frederick Douglass's* Life and Times, 99 J. Afr. Am. Hist. 56 (2014), *reprinted in* A Political Companion to Frederick Douglass 285, 287 (Neil Roberts ed., 2018) ("Douglass frequently invoked the law of nature both because he was convinced of its profound truth and also by virtue of its utility in various practical applications.").

None of Plaintiffs' claims approach a violation of the natural principles guarded in the Reconstruction Amendments, nor could the nature of their work approach the atrocities the

Collection Law, the majority rescues Plaintiffs from their own choices by allowing a host of statutory and common law claims. Respectfully, the District Court's decision dismissing the entire action got it right. Despite having the means, Plaintiffs did not pay child support. Despite Pennsylvania law giving them recourse to modify that order, they filed no petitions. Despite having the option not to, Plaintiffs asked to work during their confinement for contempt. None of these choices is disputed, none of the facts challenged. Still, claims of forced servitude, human trafficking, and unfair labor can now proceed. But regrets do not demand remedies in federal court, and the fact Plaintiffs' choices produced unappealing consequences does not require new definitions of torture and labor. So I dissent in part from the majority's decision.

## I.

This action began (and really ended) when Plaintiffs failed to pay child support. No party argues that the court orders directing Plaintiffs to provide for their children were unlawful. None dispute that Plaintiffs failed to make those payments to their families. And there is no disagreement what happened next: After long periods without paying, each was cited for civil contempt. Hearings followed and a judge found, beyond a reasonable doubt,[2] that each Plaintiff had the present

Thirteenth Amendment protects against. Calling what amounts to a wage and hour dispute a violation of these laws would be a most remarkable departure from the Amendment's original meaning and disrespectful to that historic achievement.

[2] *See Hyle v. Hyle*, 868 A.2d 601, 604–05 (Pa. Super. Ct. 2005) ("To be found in civil contempt, a party must have violated a court order" and "the court, in imposing coercive imprisonment for civil contempt, should set conditions for

3

ability to pay the amounts owed to their children.[3] Pay that amount, the court ordered, or serve a fixed term in prison for contempt. That order and those findings have never been challenged. Not at the contempt hearing. Not on appeal. Not in a petition to modify the payments, a petition that "may be filed *at any time* and shall be granted if the requesting party demonstrates a substantial change in circumstances." 23 Pa. C.S. § 4352(a) (my emphasis). In short, Plaintiffs skipped their support payments and wound up in contempt of court. Decisions have consequences.

So how did this turn into a federal question? Neither Plaintiffs nor the majority are clear. "The law in [Pennsylvania] is . . . that the trial court must set the conditions for a purge in such a way as the contemnor has the present ability to comply with the order." *Hyle*, 868 A.2d at 605. Meaning Plaintiffs could have paid their debt and purged their contempt. Or, if their circumstances shifted after the hearing, they could have asked for relief under 23 Pa. C.S. § 4352(a). Why did Plaintiffs ignore these options? The Complaint—their second—offers no answers. Instead, there is a single statement that *one* Plaintiff, "Mr. Burrell[,] did not have $2,129.34—in fact, he had nothing close to that." App. 115, ¶ 28. And one other line, nearly identically worded for each Plaintiff, noting that, "lacking any other option, [Plaintiff] was compelled to

_____

purging the contempt and effecting release from imprisonment with which it is convinced *beyond a reasonable doubt*, from the totality of the evidence before it, the contemnor has the present ability to comply." (citations and quotations omitted)).

[3] Child support payments follow guidelines based on the means of the parent and the needs of the child. 23 Pa. C.S. § 4322(a).

4

work at the Center." *See* App. 117, ¶ 36; App. 120, ¶ 67; App. 122, ¶ 88. Allegations that fall below the pleading standards we regularly enforce in matters prepared by far less sophisticated counsel. *See, e.g.*, *Fantone v. Latini*, 780 F.3d 184, 193 (3d Cir. 2015) (noting that even with pro se complaints, "we nonetheless review the pleading to ensure that it has 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on [its] face'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))). That, as the District Court concisely concluded, means "the undisturbed Court of Common Pleas orders conclusively established that Plaintiffs were able to pay the purge at the time of their incarceration, [and that] Plaintiffs' conclusory assertions regarding 'lacking any option' but to work at the Center and Plaintiff Burrell's statement that he 'did not have $2,129.43' are not entitled to a presumption of truth." App. 62 (citations omitted).

We do not face men wrongfully imprisoned. Or, as the United States awkwardly attempted to analogize, women abducted and forced into sex slavery. *See* Oral Arg. at 34:03–34:16 (Counsel for the United States) ("You can imagine victims of sex trafficking who aren't—they aren't—chained in the room. They're not locked in the basement. They could potentially leave."). Plaintiffs were found in willful contempt of an order to financially support their children. With ample process, each received an opportunity to cure his contempt by paying what he owed. And beyond a reasonable doubt,

5

Plaintiffs had the ability to pay[4] and avoid prison altogether.[5] If all of that is wrong, Commonwealth courts were, and still are, available to reconsider.

Properly framed, Plaintiffs' claims should be dismissed. Instead, the majority makes room for claims of human trafficking and unfair labor, reading new meanings into old laws to draw conclusions reached by no other federal circuit. That, I believe, is erroneous.

## II.

Begin with the Trafficking Victims Protection Act ("TVPA"). The TVPA prohibits "knowingly provid[ing] or

---

[4] "[M]odification may be applied to an earlier period if the petitioner was precluded from filing a petition for modification by reason of a significant physical or mental disability, misrepresentation of another party or other compelling reason and if the petitioner, when no longer precluded, promptly filed a petition." 23 Pa. C.S. § 4352(e). True, the process expressly excludes "incarceration for nonpayment of support." 23 Pa. C.S. § 4352(a.2). But the purge amount is set before surrender and calculated on the present ability to pay. Meaning that right now, Plaintiffs can challenge the purge amount that led to their contempt.

[5] As with the District Court, we need not "determine that the state court judgment was erroneously entered in order to grant the requested relief." *In re Knapper*, 407 F.3d 573, 581 (3d Cir. 2005) (citation omitted). "[I]f the circumstances in existence at the time the state court entered the contempt orders changed thereafter," "Plaintiffs could have availed themselves of the provisions of 23 Pa. C.S. § 4352" to modify the orders. App. 52.

6

obtain[ing] the labor or services of a person" through a host of unlawful means or "knowingly benefit[ting]" from joining a venture involving forced labor. 18 U.S.C. § 1589(a), (b). Claims under the TVPA usually "involve circumstances such as squalid or otherwise intolerable living conditions," "threats of legal process such as arrest or deportation," and "exploitation of the victim's lack of education and familiarity with the English language, all of which are 'used to prevent [vulnerable] victims from leaving and to keep them bound to their captors.'" *Muchira v. Al-Rawaf*, 850 F.3d 605, 618–19 (4th Cir. 2017) (quoting *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015)) (alteration in original).[6] Plaintiffs

---

[6] Not surprisingly, reported TVPA decisions turn on appalling criminal conduct and shocking depravity. *See, e.g.*, *Bistline v. Parker*, 918 F.3d 849 (10th Cir. 2019) (members of a congregation shielded a man who engaged in child rape, forced labor, and extortion); *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017) (Souter, J.) (prostitution scheme where "McLean physically and sexually abused Ricchio, repeatedly raping her, starving and drugging her, and leaving her visibly haggard and bruised"); *United States v. Callahan*, 801 F.3d 606, 620 (6th Cir. 2015) (a developmentally disabled young woman and her minor daughter deprived of food, locked in a basement for hours on end, forced to beat each other on camera while "Defendants threatened to show the video to the police and Children's Services if [the young woman] talked to any strangers, went to her mom's house, or otherwise 'messed up'"); *United States v. Jungers*, 702 F.3d 1066 (8th Cir. 2013) (purchasers of commercial sex acts with children); *United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) (immigrant housekeeper who, among other things, was forbidden from leaving the apartment without permission, denied her passport,

allege three theories, but the majority relies on only one: that Plaintiffs' labor was procured through the "abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(3), (b). To sustain a claim under the TVPA's "abuse of law" clause, Plaintiffs must plausibly allege the "use of a law or legal process . . . in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). Plaintiffs point to the direct acts of the County, and the indirect beneficiaries of those acts: the Authority, Corporation, and DeNaples. Meaning Plaintiffs must adequately allege first, that their work at the recycling facility was obtained through an abuse of law and legal process, and second, that Defendants knew, or recklessly disregarded, the fact that their labor was obtained through unlawful means. The Complaint lacks any allegation, no matter how generously construed, that plausibly satisfies these requirements

First, there is no plausible allegation Plaintiffs worked at the recycling facility because of an abuse of law. Plaintiffs start generally, stating Defendants (all of them) "force Debtors to work at the Center before they can 'qualify' for work release. This means that for potentially hundreds of Debtors, forced

---

threatened with financial harm, and threatened that her children would suffer harm if she were to leave the employment); *United States v. Todd*, 627 F.3d 329 (9th Cir. 2010) (prostitution ring of young girls who were beaten, threatened, and, in at least one instance, forced to undergo an abortion). Sorting recyclables is nothing of the sort.

labor has been the price of freedom from incarceration."[7] App. 113, ¶ 3. That "prevent[s] Debtors from earning wages through work release that would benefit Debtors and their children, who would receive those wages through child support payments." App. 113, ¶ 4. Meaning Plaintiffs are held as captives, unable to pay their way to freedom by earning enough to pay their debts. Appalling, and a likely violation of the Thirteenth Amendment, if true.

Thankfully, it is not. Because, again, Plaintiffs have not been incarcerated as debtors and are not ordered to work to pay their creditors. They are civil contemnors found capable of paying child support amounts lawfully ordered. Lost in the discussion, but plain in the law and facts: Plaintiffs did not have to participate in the Commonwealth's discretionary work release program.[8] That is because the work program is not

---

[7] The Complaint refers to Plaintiffs collectively as "Debtors" in a clumsy attempt, one supposes, to imply a violation of *Bearden v. Georgia*, 461 U.S. 660 (1983).

[8] *See* 42 Pa. C.S. § 9812 ("Nothing in this chapter shall be construed as creating an enforceable right in any person to participate in an intermediate punishment program in lieu of incarceration."). *See also Maldonado v. Karnes*, No. 3:CV-14-1330, 2014 WL 5035470, at *5 (M.D. Pa. Oct. 8, 2014) ("An inmate does not have a protected liberty or property interest in prison employment. The right to earn wages while incarcerated is a privilege, not a constitutionally guaranteed right." (citing *James v. Quinlan*, 866 F.2d 627, 629–30 (3d Cir. 1989); *Bryan v. Werner*, 516 F.2d 233, 240 (3d Cir. 1975) ("We do not believe that an inmate's expectation of keeping a particular prison job amounts either to a 'property' or 'liberty' interest entitled to protection under the due process clause.")).

9

designed to provide Plaintiffs with an opportunity to earn money to purge their contempt. Rather, the work program "fills gaps in local correctional systems and addresses local needs through expansion of punishment and services available to the court." 42 Pa. C.S. § 9803. Calling Plaintiffs "Debtors" in a "prison" does not make it so.[9]

Second, Plaintiffs do not, and cannot, allege Defendants knowingly benefitted from an abuse of law, 18 U.S.C. § 1589(b), or a "venture" that they "knew or should have known [was] engaged in an act in violation of" the TVPA, 18 U.S.C. § 1595(a).[10] *See Muchira*, 850 F.3d at 622–23.

---

[9] Left mostly unsaid is what role the Commonwealth courts are alleged to play in this scheme. Plaintiffs dance up to the line stating, "[s]ince at least 2006, a significant number of the prisoners supplied . . . for work at the Center have been placed in the Prison following civil contempt proceedings for failure to pay child support." App. 130, ¶ 145. And that "[u]pon information and belief, individuals deemed able to pay their [child] support obligations are routinely held in civil contempt." App. 130, ¶ 148. That suggests Defendants enjoy a steady supply of labor courtesy of an at least tacitly complicit judiciary. Such shocking suggestions demand far more specificity if they are to support a civil cause of action.

[10] On January 5, 2023, Congress enacted the Abolish Trafficking Reauthorization Act of 2022, which amended § 1595(a) to extend liability to "whoever knowingly benefits or attempts or conspires to benefit" from a TVPA violation. Pub. L. No. 117-347, 136 Stat. 6199, 6200. Even assuming the amendment applies retroactively, the new language does not cure Plaintiffs' pleading deficiencies which fail to show a knowing abuse of the law as required by the TVPA.

Plaintiffs, and the majority, offer a single speculation: "No individual who could pay his way to freedom would choose to work in the dangerous conditions of the Recycling Center for just five dollars per day." Maj. Op. at 12, 23. But that conclusion contains three problems. For one, it is not alleged. For another, it could not be alleged because, at the risk of repetition, there is no allegation that the Commonwealth court erred in setting the purge amount. And finally, if there were error, it could be corrected in the Commonwealth courts at any time. This is my key point of disagreement with the majority. Speculation about Plaintiffs' choices cannot substitute for the allegations in the second amended complaint. Perhaps it is puzzling why they chose jail over supporting their children. But it is equally puzzling that Plaintiffs would ignore the ample opportunities to remedy an incorrect contempt finding, particularly with the able assistance of the half-dozen attorneys and students from firms, schools, and clinics backed by public interest groups and the United States Department of Justice. Yet that is where we stand.

Nor can the invocation of the "dangerous and disgusting conditions," Maj. Op. at 5, and colorful descriptions of "sorting through trash," Maj. Op. at 5, 12, carry the ominous implications Plaintiffs seek. All can agree that working at a recycling factory is dirty, difficult, and demanding. Respectfully, to both the majority and the millions of workers who serve neighborhoods in the Commonwealth and across the nation, that is the nature of physical labor. Not all sit at a keyboard. Many would not even if given the choice. The suggestion that because work is rigorous it must also be repugnant finds no support in law, logic, or human

11

experience.[11] And it cannot shoulder the weight the majority assigns, that knowledge of recycling facility conditions allows an inference of knowledge of an abuse of the law. Because there is no allegation that Defendants were aware Plaintiffs supposedly could not pay their purge amounts and could not redress that legal error through the means provided by the Commonwealth, and thus could be preyed upon by Defendants' exploitative venture. The knowledge requirement of the TVPA demands much more than an awareness of

---

[11] By describing the work Plaintiffs do as repulsive, counsel perpetuates the stigmatization of "dirty work," the "tasks and occupations that are likely to be perceived as disgusting or degrading." *See* Blake E. Ashforth & Glen E. Kreiner, *"How Can You Do It?": Dirty Work and the Challenge of Constructing a Positive Identity*, 24 Acad. Mgmt. Rev. 413, 413 (1999). Occupations like recycling are essential to society but haunted by "[p]hysical taint," either by association "with garbage, death, [or] effluent," or involving "particularly noxious or dangerous conditions." *Id.* at 415. So the tasks are hidden, the workers "cast as taboo." *Id.* at 416. Yet, "abundant qualitative research from a wide variety of occupations indicates that people performing dirty work tend to retain relatively *high* occupational esteem and pride." *Id.* at 413. Rather than bemoaning the conditions of dirty work with patronizing concerns, we might note the importance of such labor and its consistency with the goals of the Commonwealth's inmate work program "[t]o provide opportunities for offenders . . . [to] enhance their ability to become contributing members of the community." 42 Pa. C.S. § 9803.

"grueling" work, Maj. Op. at 17, a contrast illustrated by other cases.

Take *Ricchio v. McLean*, where a woman was abducted, driven to another state, and taken to a motel where she was "physically and sexually abused" for days, with her tormentor "raping her, starving and drugging her, and leaving her visibly haggard and bruised," all part of "grooming her for service as a prostitute subject to his control." 853 F.3d at 555. The motel owners' knowledge was evident from the "high-fives" with the abductor in the parking lot, and visits to the room where they "nonchalantly ignored Ricchio's plea for help in escaping" and witnessed Ricchio kicked and forced back to the rented room "when she had tried to escape." *Id*. All creating a "plausible understanding" that the motel owners knew their lodge was being used for rape and assault. *Id*.

Or *Bistline v. Parker*, where attorneys "acknowledged . . . serious legal questions" about "graphic evidence of the ceremonial rape of little girls." 918 F.3d at 875 (cleaned up). Still, defendants discussed their client's "illegal goals" and aided a "scheme to 'cloak' forced labor and ritual rape of young girls 'with the superficial trappings of legal acceptance.'" *Id.* (citations omitted).

*Bistline* and *Ricchio* illustrate the kind of extraordinary and unusual circumstances necessary to infer knowledge for TVPA claims. Motel managers cannot feign ignorance of sex trafficking when they see a woman locked in a room, battered and pleading to escape. Lawyers may not shrug off evidence of child abuse and rape and return to drafting trusts. The knowledge suggested in this case shatters that standard and turns the TVPA's goal of "effectuat[ing] the constitutional prohibitions against slavery and involuntary servitude" into an

13

employment action. *Muchira*, 850 F.3d at 625. That is wrong, and as the District Court correctly concluded, Plaintiffs' TVPA claims should be dismissed.[12]

## III.

Arguing in the alternative, Plaintiffs allege that if they are not slaves or involuntary servants, they must be employees under the Fair Labor Standards Act ("FLSA") and the Pennsylvania Minimum Wage Act.[13] Intricate questions about whether Defendants are employers, or joint employers, under the FLSA abound. But they need not be answered because Plaintiffs are contemnors, not employees, under the best reading of the FLSA.

Analyzing the FLSA requires that we "proceed[] methodically" through the statute's text. *Badgerow v. Walters*, 142 S. Ct. 1310, 1317 (2022). The goal, as always, is to give effect to the legislature's charge, *Brown v. Barry*, 3 U.S. (3 Dall.) 365, 367 (1797), as expressed in the text's "ordinary meaning . . . at the time Congress enacted the statute," *Perrin v. United States*, 444 U.S. 37, 42 (1979). This is a "fundamental canon of statutory construction." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (quoting *Perrin*, 444 U.S.

---

[12] Seeing no TVPA claim stated, I also see no predicate act supporting a RICO claim. 18 U.S.C. § 1962(c); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 372 & n.69 (3d Cir. 2010).

[13] Like the majority, I review Plaintiffs' claims under the FLSA, 29 U.S.C. § 206, and the Pennsylvania Minimum Wage Act, 43 Pa. C.S. § 333.101 *et seq.*, under the same standards. *See Ford-Greene v. NHS, Inc.*, 106 F. Supp. 3d 590, 612–13 (E.D. Pa. 2015).

14

at 42). *See also Minor v. Mechanics' Bank of Alexandria*, 26 U.S. (1 Pet.) 46, 64 (1828). We interpret the language using all "the standard tools of interpretation," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019), reading the words "in their context and with a view to their place in the overall statutory scheme," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019) (citation omitted). *See also United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386 (1805) ("It is undoubtedly a well established principle in the exposition of statutes, that every part is to be considered, and the intention of the legislature to be extracted from the whole."). And where these efforts lead to multiple ordinary meanings, we adopt "the best reading" of the statutory text. *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2442 (2021).

**A.**

The FLSA states an "employee" is "any individual employed by an employer," 29 U.S.C. § 203(e)(1), an explanation that directs us to technical rather than ordinary meaning. *See Lopez v. Att'y Gen.*, 49 F.4th 231, 234 n.4 (3d Cir. 2022). While ordinary and competent English speakers likely have a reasonable understanding of the word, the FLSA creates a legal distinction to extend particular rights and benefits to a limited class. *See Moskal v. United States*, 498 U.S. 103, 121 (1990) (Scalia, J., dissenting) ("[W]hen a statute employs a term with a specialized legal meaning relevant to the matter at hand, that meaning governs."). The definition of "employee" is part of the specialized guidelines for employers to comply with requirements for wages and hours, a way to know who deserves what. *Cf. Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 18 (2011) (Scalia, J., dissenting) (looking to the context of the phrase "filed any complaint" within the FLSA and determining that "at the time

15

the FLSA was passed (and still today) the word [complaint] when used in a legal context has borne a specialized meaning"). So the term "must be read by judges with the minds of the specialists." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 536 (1947).[14]

Legal sources at the FLSA's enactment defined "employee" as "[o]ne who works for an employer," generally including "a person working for salary or wages," but "rarely to the higher officers of a corporation or government or to domestic servants." Black's Law Dictionary 657 (3d ed. 1933). Those general concepts yield to specific applications, "and whether one is an employee or not will depend upon particular facts and circumstances." *Id.*; *see, e.g.*, *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 571–72 (1943) ("The applicability of the Act is dependent on the character of the employees' work."). So our focus is not on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

The "circumstances of the whole activity" here, the genesis of Plaintiffs' work, is their custody. Without the contempt finding, they would not be committed to the Lackawanna County Prison. And Plaintiffs agree they are in custody and that their work is tied to their incarceration. App. 115–16, ¶¶ 24–29 (Burrell); App. 119–20, ¶¶ 60–63, 67 (Huzzard); App. 121–22, ¶¶ 83–88 (Stuckey). Custody is

---

[14] Even though there is not much difference between the legal and ordinary meaning. *See* Webster's New International Dictionary of the English Language 718 (1930) (defining employee as "[o]ne employed by another; a clerk or workman in the service of an employer, usually disting. from *official* or *officer*, or one employed in a position of some authority").

another legal term, meaning "the detainer of a man's person by virtue of lawful process or authority," an "actual imprisonment." Black's Law Dictionary 493–94 (3d ed. 1933).[15] *See also Kelley v. Oregon*, 273 U.S. 589, 591 (1927) (describing the plaintiff as being "constantly in the custody of the warden of the penitentiary inside and outside of the courtroom, during the trial" and finding "[i]t is a new meaning attached to the requirement of due process of law that one who is serving in the penitentiary for a felony and while there commits a capital offense must, in order to secure a fair trial, be entirely freed from custody"); *Sibray v. United States*, 185 F. 401, 403–04 (3d Cir. 1911) ("The custody complained of must be actual and not constructive" and contrasting someone "in . . . custody or control" with one "out on bail."); *Smith v. Commonwealth*, 59 Pa. 320, 324 (1869) ("Custody is the detainer of a person under lawful authority.").

These "common linguistic intuitions" are "at least strained by the classification of prisoners as 'employees.'" *Vanskike v. Peters*, 974 F.2d 806, 807 (7th Cir. 1992). First, the prison does not act as Plaintiffs' employer. It is, rather, the caretaker of Plaintiffs "by virtue of lawful process or authority." *See* Black's Law Dictionary 493–94 (3d ed. 1933). As such, Plaintiffs are detainees in the prison's custody, not employees. Second, Plaintiffs are not persons working for salary or wages; they are able to voluntarily participate in the

---

[15] A meaning that also mirrors ordinary understanding. *See* Webster's New International Dictionary of the English Language 554 (1930) (custody means "penal safe-keeping; control of a thing or person with such actual or constructive possession as fulfills the purpose of the law or duty requiring it; specif., as to persons, imprisonment").

17

recycling center to help "accept, process and market recyclable commodities." App. 149 (Operating Agreement between Center and Authority). That fits squarely into Pennsylvania law to "fill gaps in local correctional systems and address local needs through expansion of punishment and services available to the court." 42 Pa. C.S. § 9803. Nowhere among these statutory purposes is earning income. Rather, the programs are designed with a rehabilitative mindset to benefit both prisoners and the community—not a typical design for the average hourly job. All leaving prisoners outside the best legal reading of the FLSA.

**B.**

Context confirms that reading, as all laws are "part of an entire *corpus juris*," and we must interpret "laws dealing with the same subject" "harmoniously." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 252 (2012). *See also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 638 (2009) (noting that the Court "has consistently held" two statutes "must be read *in pari materia*"); *Lafferty v. St. Riel*, 495 F.3d 72, 81–82 (3d Cir. 2007) (interpreting two statutes using "the common canon of statutory construction that similar statutes are to be construed similarly"). And we "presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988). Just three years before the FLSA's passage in 1938, Congress enacted the Ashurst-Sumners Act of 1935, which targeted unfair competition derived from prison labor by making it illegal to knowingly transport goods made by prisoners. *See* 18 U.S.C. §§ 1761–62. *See also Danneskjold v. Hausrath*, 82 F.3d 37, 42 (2d Cir. 1996) ("[T]he Ashurst-Summers [sic] Act . . . regulates the interstate transportation of prison-made goods to

18

avoid competition between low-cost prison labor and free labor . . . ." (citation omitted)). That, as other courts have held, is strong reason to conclude prisoners are not employees protected by the FLSA. *See, e.g.*, *Danneskjold*, 82 F.3d at 42 ("[T]he continued existence of the Ashurst-Summers [sic] Act . . . reveals a congressional assumption that prison labor will not be paid at FLSA minimum wage levels."); *Harker v. State Use Indus.*, 990 F.2d 131, 134 (4th Cir. 1993) ("We must read [the FLSA and Ashurst-Sumners Act] in *pari materia* . . . . [T]he FLSA [] does not apply here because Congress has dealt more specifically with [the problem of prison goods entering the open market and threatening fair competition] through the Ashurst-Sumners Act."); *Vanskike*, 974 F.2d at 812 ("[T]he Ashurst-Sumners Act supports the conclusion that Congress did not intend to extend the FLSA's definition of 'employee' to prisoners working in prison.").

That is a sensible reading. Unlike the Ashurst-Sumners Act, the FLSA "was enacted to improve the living conditions and general well-being of free-world American workers and their bargaining strength vis-a-vis employers." *Reimonenq v. Foti*, 72 F.3d 472, 476 (5th Cir. 1996). If a prison puts its inmates "to work, it is to offset some of the cost of keeping them, or to keep them out of mischief, or to ease their transition to the world outside, or to equip them with skills and habits that will make them less likely to return to crime outside." *Bennett v. Frank*, 395 F.3d 409, 410 (7th Cir. 2005). Such goals are incompatible "with federal regulation of their wages and hours. The reason the FLSA contains no express exception for prisoners is probably that the idea was too outlandish to occur

to anyone when the legislation was under consideration by Congress." *Id.*[16]

Finally, the majority distinguishes between intra-prison work and work done by prisoners outside of the prison not for the benefit of the prison. *See* Maj. Op. at 30–32; *Tourscher v. McCullough*, 184 F.3d 236, 243 (3d Cir. 1999) ("[P]risoners who perform intra-prison work are not entitled to minimum wages under the FLSA.").[17] But there is nothing rooted in the

---

[16] Prison work serves a different purpose than the traditional goal of earning a living. "At its root, the work release program exists for the benefit of the prisoner himself. The purpose of the program is to prepare inmates upon release from prison to function as responsible, self-sufficient members of society." *Reimonenq*, 72 F.3d at 476. "Work has been an important feature of prison systems in the United States since the colonial period." Anthony Pierson, Keith Price & Susan Coleman, *Prison Labor*, 4 Pol. Bureaucracy & Just. 12, 13 (2014). And "[t]hose offenders who are employed have fewer disciplinary infractions in prison, obtain better jobs when released, and recidivate less than do unemployed prisoners." *Id.* at 12. Concepts consistent with the natural principle that "[t]he want of a useful and honest occupation is the foundation of an infinite number of mischiefs." Jean-Jacques Burlamaqui, The Principles of Natural and Politic Law 435 (Knud Haakonssen ed. 2006) (1752).

[17] The majority concludes Plaintiffs' work "mirrors" the facts in *Watson* where a Sheriff operated an unauthorized work release program and assigned prisoners to work for his daughter and son-in-law. *See* Maj. Op. at 37; *Watson v. Graves*, 909 F. 2d 1549, 1551 & n.2 (5th Cir. 1990). *Watson* applied the "economic reality test" championed by the Ninth Circuit in

20

text of the FLSA or the original understanding of the term "employee" that suggests work involving a third party or taking place outside the prison grounds converts a prisoner's status into one of an employee in a formal employment relationship. Prisoners are not employees under the FLSA because their work relationships "arise out of their status as inmates, not employees." *Franks v. Okla. State Indus.*, 7 F.3d 971, 972 (10th Cir. 1993) (cleaned up) (quoting *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991)). "The state's absolute power over appellants is a power that is not a characteristic of—and indeed is inconsistent with—the bargained-for exchange of labor which occurs in a true employer-employee relationship." *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1325 (9th Cir. 1991). This reasoning reaches all prisoners inside and outside the prison walls.

Plaintiffs were not employees while working at the Center. No work can untether Plaintiffs from their status as individuals in custody for contempt. Thus, the motions to dismiss the FLSA claims were properly granted.[18]

---

*Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) and characterized the prisoners as employees under the FLSA because they worked outside of the prison. But the economic reality test does not consider the text of the FLSA and the technical meaning of the word "employee." And the statutory history of the FLSA, including the Ashurst-Sumners Act, casts a shadow on the notion that the FLSA is Congress' intended tool for combatting unfair competition.

[18] "Where [an] unjust enrichment claim rests on the same improper conduct as the underlying tort claim, the unjust

**IV.**

Plaintiffs, really their counsel, have strong opinions. About holding delinquent dads in contempt when they stop following court orders and stop supporting their children. About sanitary work, and whether it serves a salutary purpose. How to manage a recycling plant. How much to pay prisoners. All topics fit for consideration by the Commonwealth's elected officials. Rather than pursue that option, or provide direct assistance to Plaintiffs to reduce what is repeatedly claimed to be an unjust court order, all take the plunge into protracted litigation. Offering, it seems, no help to Plaintiffs or future contemnors allegedly laboring endlessly in perpetual confinement. Moreover, such a ruling diverges from the traditional and classically ordered principles acknowledging the great duty parents hold to care for their children[19] and the

---

enrichment claim will rise or fall with the underlying claim." *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 493 (E.D. Pa. 2016). As Plaintiffs have no valid TVPA or FLSA claim, they have no unjust enrichment claim, as the District Court properly concluded.

[19] *See* 2 William Blackstone, Commentaries *435 (1765) ("The duty of parents to provide for the *maintenance* of their children is a principle of natural law; an obligation . . . laid on them not only by nature herself, but by their own proper act, in bringing them into the world . . . . By begetting them therefore they have entered into a voluntary obligation, to endeavour, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have a perfect *right* of receiving maintenance from their parents."); Burlamaqui, Principles of Natural and Politic Law 61 ("Providence for this reason has inspired

22

"great importance to use every endeavour to banish idleness, that fruitful source of disorders." Burlamaqui, Principles of Natural and Politic Law 435.[20]

Respectfully, we should follow the sound reasoning of the District Court and dismiss these novel claims, leaving all free to work, to petition the government for change, or to decline to do anything. Such is the usual way of our Republic and, accordingly, I dissent in part.

---

parents with that instinct or natural tenderness, which prompts them so eagerly to delight in the most troublesome cares, for the preservation and good of those whom they have brought into the world."); Samuel Pufendorf, The Whole Duty of Man, According to the Law of Nature 179 (Knud Haakonssen ed., Jean Barbeyrac trans. 2003) (1673) ("Because the Law of Nature it self, when Man was made a Social Creature, injoin'd to *Parents the Care of their Children*.").

[20] *See also* John Locke, Second Treatise of Government §§ 32, 42 (1689) ("God, when he gave the world in common to all mankind, commanded man also to labour, and the penury of his condition required it of him. . . . [W]hen any one hath computed, he will then see how much labour makes the far greatest part of the value of things we enjoy in this world . . . .").